Joseph **AMATEL, et al., Appellees**

v.

**Janet RENO, Attorney General of the United States, et al., Appellants**

**Nos. 97–5293, 97–5294, 97–5295.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 1998.

Decided Sept. 15, 1998.

Edward Himmelfarb, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Barbara L. Herwig, Assistant Director, U.S. Department of Justice.

Jodie L. Kelley argued the cause for appellees. With her on the brief were Ann M. Kappler, Marjorie Rifkin and Margaret Winter.

Bruce A. Taylor was on the brief for amici curiae National Coalition for the Protection of Children & Families, et al.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Dissenting opinion filed by Circuit Judge WALD.

STEPHEN F. WILLIAMS, Circuit Judge:

A group of prisoners and publishers challenges the constitutionality of a statutory ban on the use of Bureau of Prisons funds to distribute sexually explicit material to prisoners. The statute is not enforced directly; instead, the Bureau has promulgated regulations defining the terms of the proscription and significantly narrowing its scope. The district court, analyzing the statute, ruled that it was facially invalid as a violation of the First Amendment and enjoined its enforcement. Finding that scrutiny should be directed to the substance of the regulations instead, and disagreeing with the district court's evaluation, we reverse and remand.

\* \* \*

Before 1996, federal regulations authorized prison wardens to reject a publication "only if it [was] determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." 28 C.F.R. § 540.71(b). Sexually explicit material fell into this category if it "by its nature or content pose[d] a threat to the security, good order, or discipline of the institution, or facilitate[d] criminal activity." 28 C.F.R. § 540.71(b)(7). Under this standard, explicit heterosexual material was ordinarily admitted. See *Thornburgh v. Abbott,* 490 U.S. 401, 405 n. 6, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

In 1996 Congress passed the Ensign Amendment, which bars the use of Bureau of Prisons funds to pay for the distribution of commercial material that "is sexually explicit or features nudity."[1] See Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208 § 614.[2] Regulations later adopted by the Bureau assign rather narrow meanings to these terms: "nudity" means "a pictorial depiction where genitalia or female breasts are exposed"; "features" means that "the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues." Even material that otherwise would be said to "feature nudity" is excepted if it contains "nudity illustrative of medical, educational, or anthropological content." "Sexually explicit" means "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation." 28 C.F.R. § 540.72(b). Under these regulations, then, there is no restriction whatever on non-pictorial sexually explicit material.

---

1. By its terms, the statute therefore does not prohibit prisoners from obtaining such material at their own expense. Neither party has suggested that this is a realistic possibility, or discussed the rules governing gifts by visitors. Accordingly, our analysis will treat the spending restriction as a ban on distribution. Where the government absolutely monopolizes the means of speech or controls a bottleneck, as we are assuming vis-a-vis the prison distribution system, a refusal to fund functions the same as an outright ban.

2. Identical language appears in § 614 of Pub. L. No. 105–119, governing the fiscal year ending September 30, 1998, so no issue of mootness is currently posed.

In 1997, three inmates, each denied receipt of either *Playboy* or *Penthouse*, filed separate suits alleging that the Ensign Amendment violated the First Amendment. Their suits were consolidated, along with similar suits filed by the publishers of those magazines and a publishing trade organization; the consolidated plaintiffs moved for injunctive relief. The district court, purporting to apply the test set out in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), found the Ensign Amendment facially invalid—implicitly granting plaintiffs' motion for summary judgment (which, in fact, they never made)—and permanently enjoined its enforcement. 975 F.Supp. 365, 370 (D.D.C. 1997).

\* \* \*

██ Both sides agree that *Safley* sets out the appropriate framework for reviewing government regulation of prisons.[3] But before beginning that analysis, we must note that our first difference with the district court is as to the proper object of judicial scrutiny.

Plaintiffs ask for relief against both the Ensign Amendment and its implementing regulations. The district court seemed to assume that the statute itself has been and will be applied to these plaintiffs; accordingly, it directed its analysis primarily towards the statute. *Id.* at 368–70. But there is no suggestion that any warden does or will apply the statute directly; so far as appears, all enforcement is mediated through the regulations.

Insofar as plaintiffs attack the proscriptions of the statute not embodied in the regulations, they effectively pursue a pre-enforcement challenge. Even in the First Amendment context, such a challenge presents a justiciable controversy only if the probability of enforcement is "real and substantial." *Salvation Army v. Dep't of Comm. Affairs*, 919 F.2d 183, 192 (3d Cir. 1990); see also *Steffel v. Thompson*, 415 U.S. 452, 460, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In the statutory borderland beyond the implementing regulations (i.e., the statute's apparent ban on some non-pictorial material, its vaguer language, and its lack of any exception for medical or educational material), the prospect of enforcement appears completely insubstantial. It is as if the government had waived certain provisions of the law. And with such a waiver, as *Salvation Army* explicitly holds, there is no standing to challenge the waived provisions. See 919 F.2d at 192–93 ("[T]he district court should decline to provide an advisory opinion regarding the constitutionality of these provisions."). See also *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (evaluation of facial challenge to statute must take into account construction by enforcing body). We therefore limit our focus to the substantive prohibitions of the regulations.[4]

\* \* \*

Cases analyzing constitutional claims by those within governmental institutions such as prisons, public schools, the military, or the government workplace often open with the axiom that the boundaries of those institutions do not separate inhabitants from their constitutional rights. See, e.g., *Safley*, 482 U.S. at 84, 107 S.Ct. 2254 ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("[I]t has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or

---

3. The claims of the publisher plaintiffs might seem to call for a different analysis, as they of course are not prisoners. *Thornburgh* makes clear, however, that *Safley*'s reasonableness standard governs "regulations that affect[ ] rights of prisoners and outsiders." 490 U.S. at 410 n. 9, 109 S.Ct. 1874.

4. Our dissenting colleague relies on two recent decisions invalidating provisions that are more similar to the statute than to the regulatory interpretation established in this case. *Mauro v. Arpaio*, 147 F.3d 1137 (9th Cir.1998); *Waterman v. Verniero*, 12 F.Supp.2d 378 (D.N.J. 1998). See Dissent at 203–204 n.1. Because we see the only ripe case before us as confined to the regulations, our case is plainly distinguishable.

expression at the schoolhouse gate."); *General Media Communications, Inc. v. Cohen,* (*"GMC"*) 131 F.3d 273, 276 (2d Cir.1997) ("The Constitution does not, of course, stop at the gates of a military base."). This observation is invariably followed by the complementary principle that by their nature such environments must allow regulation more intrusive than what may lawfully apply to the general public. See *Safley,* 482 U.S. at 84–85, 107 S.Ct. 2254; *Connick,* 461 U.S. at 143, 103 S.Ct. 1684; *Tinker,* 393 U.S. at 507, 89 S.Ct. 733; *GMC,* 131 F.3d at 276. In these environments, the government is permitted to balance constitutional rights against institutional efficiency in ways it may not ordinarily do.[5] See, e.g., *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (describing governmental power to restrict speech in the name of efficiency); *Safley,* 482 U.S. at 88, 107 S.Ct. 2254 (noting balancing between First Amendment rights and governmental interests).

■ For the prison context, *Safley* directs courts to uphold a regulation, even one circumscribing constitutionally protected interests, so long as it "is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. 2254. We are to assess the overall reasonableness of such restrictions with attention to four factors: first, whether the restriction bears a "valid, rational connection" to the "legitimate governmental interest put forward to justify it," such that the "asserted goal is [not] so remote as to render the policy arbitrary or irrational," *id.* at 89–90, 107 S.Ct. 2254; second, whether inmates retain alternative means of exercising the circumscribed right, *id.* at 90, 107 S.Ct. 2254; third, the costs that accommodating the right imposes on other inmates, guards, and prison resources generally, *id.*; and fourth, whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests," *id.* at 90–91, 107 S.Ct. 2254. Although

the factors are intended as guides to a single reasonableness standard, see *id.* at 89, 107 S.Ct. 2254; see also *Thornburgh,* 490 U.S. at 414, 109 S.Ct. 1874 ("The Court in [*Safley*] identified several factors that are relevant to, and that serve to channel, the reasonableness inquiry."), the first factor looms especially large. Its rationality inquiry tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions. Nothing can save a regulation that promotes an illegitimate or non-neutral goal. See *Safley,* 482 U.S. at 90, 107 S.Ct. 2254.

■ In this case, both proponents in congressional debate, and the government in its briefs here, assert as the goal an interest in the rehabilitation of prisoners. See, e.g., 142 Cong. Rec. H8261 (daily ed. July 24, 1996) ("Congress should not be fueling the sexual appetites of offenders, especially those who have been convicted of despicable sex offenses against women and children. Magazines that portray and exploit sex acts have no place in the rehabilitative environment of prisons, nor should we pay Bureau of Prison[s] staff to distribute them.") (statement of Rep. Ensign); *id.* at H8262 ("The infamous serial killer Ted Bundy . . . stated before his death his belief that pornographic materials directly contributed to his violent crimes. While a number of factors determine whether a prisoner will become a law-abiding citizen upon release from prison, cutting prisoners off from their sexually explicit magazines will certainly do no harm.") (statement of Rep. Ensign). The next question is whether rehabilitation is a legitimate and "neutral" government interest within the meaning of *Safley.*

The legitimacy of the rehabilitative purpose appears indisputable. Indeed, the Supreme Court has often characterized rehabilitation as one of the primary goals of penal institutions. See, e.g., *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (describing rehabilitation

---

5. This distinction is often phrased in terms of differential standards of review applicable to the government when it acts in roles other than sovereign. See, e.g., *Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). But it may be more apt to conceive of it

as a distinction between government regulation of public discourse generally, and government regulation of speech within governmental institutions. See generally Robert Post, *Constitutional Domains* 199–268 (1995).

as "valid penological objective[ ]"); *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (identifying "substantial government interests of security, order, and rehabilitation"). At least since the mid–19th century, it is hard to imagine a prison system that did not seek to reduce the likelihood that prisoners would again transgress society's norms. The inventors of the prison in New York and Pennsylvania framed its goals in these terms:

> The penitentiary, free of corruptions and dedicated to the proper training of the inmate, would inculcate the discipline that negligent parents, evil companions, taverns, houses of prostitution, theaters, and gambling halls had destroyed. Just as the criminal's environment had led him into crime, the institutional environment would lead him out of it.

David J. Rothman, *The Invention of the Asylum: Social Order and Disorder in the New Republic* 82–83 (rev. ed.1990).

In turning to "neutrality," the district court looked at the statute itself, not the goal, and found it non-neutral. "[T]he Ensign Amendment is a content-based statute with a sole focus on the sexual nature of the publications it seeks to prohibit." 975 F.Supp. at 368. The conclusion is correct—the Ensign Amendment is formulated in terms of content. But we do not understand that characteristic to run afoul of *Safley*'s neutrality requirement. Despite the apparent similarity in terms, "neutrality" in the *Safley* sense is quite different from the familiar First Amendment notion of "content-neutrality." The Court most recently explained in *Thornburgh* that "neutral" here means no more than that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." 490 U.S. at 415, 109 S.Ct. 1874 (quoting *Martinez*). There the Court found neutrality simply because in application of the regulations the prison administrators were to "draw distinctions between publications solely on the basis of their potential implications for prison security." *Id.* It pointed out that the regulations struck down in *Martinez,* in contrast, barred writings that "unduly complain[ed]"

or "magnif[ied] grievances," or expressed "inflammatory" views, thus inviting the prison authorities " 'to apply their own personal prejudices and opinions as standards for prisoner mail censorship.' " 490 U.S. at 416 n. 14, 109 S.Ct. 1874 (quoting *Martinez*); see also *Martinez,* 416 U.S. at 415, 94 S.Ct. 1800 (striking down regulations because no legitimate interest at all was offered as justification). Thus the *Martinez* regulations were "decidedly not 'neutral' in the relevant sense." *Thornburgh,* 490 U.S. at 416 n. 14, 109 S.Ct. 1874.

The rehabilitative interest offered by the government here meets this rather thin neutrality requirement. The Court cannot have meant to insist upon neutrality in its classic First Amendment sense, as embodied, for example, in the dictum of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that "[u]nder the First Amendment, there is no such thing as a false idea." In its role as an operator of prisons, the government surely does not lapse from the required neutrality if it bans "how-to" manuals on fraud and embezzlement ("Fraud for Dummies"). The idea that committing such crimes is not proper may not be "false" in the *Gertz* sense, but in the prison context the government may oppose it rather absolutely. This authority cannot be explained away on the theory that such a ban could withstand even the strictest scrutiny and that its validity therefore tells us nothing of the "neutrality" requirement; as voiced by the Court, the "neutrality" requirement is an absolute prerequisite. Accordingly, we think the Court's actual application of the requirement, with its focus on the existence of some legitimate goal and on assuring that rules are in fact not framed so as to advance illegitimate or unvetted goals, must control our understanding of its meaning.

That government power to inculcate values conflicts with the libertarian premises of the First Amendment is clear, but such power is well established. Even outside special governmental institutions, the state has some authority to become a player in the marketplace of ideas. It may commission advertising urging children to stay in school or off drugs; it can sponsor anti-violence campaigns. See *Regan v. Taxation with Repre-*

*sentation,* 461 U.S. 540, 548–49, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); see generally *Rust v. Sullivan,* 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way.").

And within its own institutions, government's power to pursue its legitimate goals is elevated: within reasonable limits, it may attach sanctions to or exclude speech that threatens its goals—even if those goals include promotion of particular values. That is the general lesson of cases such as *Waters,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (upholding dismissal of employee for speech that might have caused disruption); *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (upholding suspension of student who used indecent language in assembly speech); and *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding exclusion from military base of civilians who wished to distribute political literature).

Of course this does not mean by a long shot that every government institution can pursue any value. Our century has seen more than enough of governments trying to act as engineers of human souls. But inculcation of values cannot be characterized as a suppression of expression in every context. The Supreme Court has in fact taken the position that democratic society *depends on* inculcation of democratic values. See, e.g., *Ambach v. Norwick,* 441 U.S. 68, 76–77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (stating that public schools are important "in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests"); *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873, (1954) ("[Public education] is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment."). The generality of *Safley*'s reasonableness test, and common sense as well, suggest that the flexibility open to the political branches must be at its apogee in institutions for the care and custody of those who have already transgressed society's norms. If "promoting respect for authority and traditional values" among schoolchildren is a legitimate interest of government and not inherently a form of speech suppression, see *Board of Education, Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion), surely the same is true of promoting such a goal among criminals.

Prisoners of course differ from the other examples of individuals entangled with the government in that they have no recourse to a private sphere. For them, there is no outside. Judges plainly must bear in mind the total occupation of prisoners' lives by the state. But prisoners find themselves in the maw of the state not because they have been drawn there by the promise of government wages, nor because a statute imposes a universal requirement of education, but because they have broken the law. Moreover, even government workers have suffered a similar eclipse of the private sphere; the government's ability to fire them for speech that threatens workplace disruption is not limited to speech *within* the workplace. See, e.g., *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (analyzing letter to the editor). See generally Note, The Costs of Agencies: Waters v. Churchill and the First Amendment in the Administrative State, 106 Yale L.J. 1233, 1239–40 (1997) (discussing scope of governmental authority). Accordingly, we conclude that rehabilitation, and such character-moulding as may be implicit therein, constitute legitimate and neutral goals as those are understood in *Safley.*

\* \* \*

We thus turn to whether there is a "valid rational connection" between the interest and the regulations. Prison jurisprudence is not well enough developed to indicate precisely how demanding the requirement of rational means-end connection is. But the similarity between *Safley*'s phrasing and the language of rational basis review suggests to us that, as far as the

means-end fit is concerned, *Safley's* standard is, if not identical, something very similar. Compare, e.g., *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("[T]he relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.") with *Safley*, 482 U.S. at 89–90, 107 S.Ct. 2254 ("[T]he logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.").

The legislative judgment is that pornography adversely affects rehabilitation. It does not matter whether we agree with the legislature, only whether we find its judgment rational. The question for us is not whether the regulation in fact advances the government interest, only whether the legislature might reasonably have thought that it would. See, e.g., *Nordlinger*, 505 U.S. at 11, 112 S.Ct. 2326.

■ We think that the government could rationally have seen a connection between pornography and rehabilitative values. Congress might well perceive pornography as tending generally to thwart the character growth of its consumers. One current exposition of this view sees pornography as treating women purely as objects of male sexual gratification. See, e.g., Catharine A. MacKinnon, *Only Words* 108–10; MacKinnon, "Francis Biddle's Sister: Pornography, Civil Rights, and Speech," in *Feminism Unmodified* 163, 174 (1987); Martha C. Nussbaum, "Objectification," 25 *Phil. & Pub. Affairs* 249, 283–86 (1995); Cass Sunstein, *The Partial Constitution* 257–90 (1993). But this viewpoint shares at least a core with ideas that have a lineage of a few centuries, perhaps millennia, stressing the desirability of deferring gratification, of sublimation of sexual impulses, of channeling sexual expression into long-term relationships of caring and affection, of joining eros to agape. The supposition that exclusion of pornography from prisons will have much of an impact in this direction may be optimistic, but it is not irrational.

There is, of course, no "record evidence," and certainly no sophisticated multiple regression analyses or other social science data, to support this belief—a fact our dissenting colleague finds fatal. See Dissent at 207–08. We do not think, however, that common sense must be the mere handmaiden of social science data or expert testimonials in evaluating congressional judgments. Quite the opposite: scientific studies can have a corrective effect by establishing an apparently implausible connection or refuting an apparently obvious one, but, subject to such corrections, conformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality. Compare D.N. McCloskey, *The Rhetoric of Economics* 44 (1985) ("Not all regression analyses are more persuasive than all moral arguments; not all controlled experiments are more persuasive than all introspections. People should not discriminate against propositions on the basis of epistemological origin. There are some subjective, soft, vague propositions that are more persuasive than some objective, hard, precise propositions."). Nor do we think *Safley* requires more. In that case, the Court scoured the record for evidence of a rational link between the asserted security interests and the marriage ban because common sense does not suggest any. See *Safley*, 482 U.S. at 97–100, 107 S.Ct. 2254. Here, the regulations restrict prison consumption of publications that implicitly elevate the value of the viewer's immediate sexual gratification over the values of respect and consideration for others. Common sense tells us that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are themselves degrading and disrespectful.

Nor can we find irrationality in a congressional fear that pornography may set back rehabilitation in the narrower sense, more directly related to recidivist activity. The briefs, particularly that of the amicus curiae, call our attention to studies purporting either to document or to demolish the causal link between pornography and sex crimes.[6]

6. Congress did not cite these materials, an omission of no importance. See *Jones v. United*

Without attempting a comprehensive summary, we note a few. One concludes that exposing "already angered men" (probably not especially rare in prison) to nonviolent pornography can lead to short-term increases in their aggressiveness. Edward Donnerstein, et al., *The Question of Pornography* 40–48 (1987). Another finds that "pornography provides ideational support for rape...." Larry Baron & Murray A. Straus, *Four Theories of Rape in American Society* 185 (1989). Baron & Straus's primary evidence for this claim is an observed correlation between the circulation rates of sex magazines and reported rape rates. While they are hesitant to defend a "cause-effect" link between pornography and rape, they do see the correlation as explained by "the presence of a hypermasculine or macho culture pattern." *Id.* at 186. This cultural pattern, Baron and Straus hypothesize, causes both higher incidence of rape and higher consumption of pornography. Of course, it seems quite likely that a culture and its manifestations have a mutually reinforcing relationship, so that a prohibition of pornography is a reasonable element of a struggle against machismo and its ill effects.

Finally, there is a significant body of research showing that long-term exposure to pornography, particularly pornography containing scenes of "aggressive sexuality," can make its (male) audience more aggressive, more tolerant of violence against women, and more susceptible to myths about rape, such as the notion that women can enjoy being raped. See Neil Malamuth, "Aggression against Women: Cultural and Individual Causes," in Malamuth & Donnerstein, 19, 32–39; see also Mike Allen et al., "Exposure to Pornography and Acceptance of Rape Myths," 45 J. Communication 5 (1995) ("Although the experimental studies demonstrate that violent pornography has more effect [inducing rape myth acceptance] than nonviolent pornography, nonviolent pornography still demonstrates an effect.") See also Rich-

ard A. Posner, *Sex and Reason*, 366–71 (1992) (noting inconclusiveness of social science findings on net effects of pornography on incidence of rape; pornography may tend to increase rape by its ideological and aphrodisiac effects, but may tend to decrease it by enhancing a substitute (masturbation), the balance of these effects being unknown).

The point of this is not to suggest that a causal link has been shown. The array of academic authority on the other side is at least as substantial, and quite possibly more so. But even undertaking to weigh the competing scholarship would misconceive the judicial role. Dealing with legislative judgments about rehabilitation, the Supreme Court has said that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, *arguendo*, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (emphasis in original); see also *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 2081 n. 3, 138 L.Ed.2d 501 (1997). And in upholding a statute barring provision of sexually explicit material to minors, the Court noted that "while these studies all agree that a causal link [between exposure to explicit material and impaired ethical and moral development] has not been demonstrated, they are equally agreed that a causal link has not been disproved either." *Ginsberg v. New York*, 390 U.S. 629, 642, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (internal quotation omitted); see also *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 329 n. 3 (7th Cir.1985). The same uncertainty prevails here, and suffices to place the legislative judgment within the realm of reason under the standards applicable to the political branches' management of prisons.

The evidence is simply not conclusive on the efficacy of a ban on pornography in pro-

*States*, 463 U.S. 354, 365 n. 13, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). Our concern is not why Congress believed that pornography affected rehabilitation, but whether it would have been rational so to believe. Cf. *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 117 S.Ct.

1174, 1197, 137 L.Ed.2d 369 (1997) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review.").

moting prisoners' rehabilitation. For judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative.

\* \* \*

The remaining *Safley* factors further substantiate the overall reasonableness of the regulations. The second involves the prisoners' alternative means of exercising the right at stake. Of course if the "right" at stake is defined in terms of the materials excluded by the ban, any regulation will come up short. The Court accordingly observed in *Thornburgh* that the relevant right "must be viewed sensibly and expansively," 490 U.S. at 417, 109 S.Ct. 1874, though it stated no method for actually carrying out the definitional process. In *Thornburgh*, where the regulation barred all "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity," *id.* at 405 n. 5, 109 S.Ct. 1874, the Court found the second factor "clearly satisfied" because "the regulations [there at issue] permit a broad range of publications to be sent, received, and read," *id.* at 418, 109 S.Ct. 1874. In so doing, it made no inquiry into the scope of sexually explicit material not covered by the ban. Thus, unless there is some minimum entitlement to smut in prison, the origins of which must be obscure, this factor can hardly be fatal.[7]

The third *Safley* factor concerns the adverse impact "on guards and other inmates, and on the allocation of prison resources" of accommodating the right claimed. 482 U.S. at 90, 107 S.Ct. 2254. It thus seems in part a restatement of the deferential balancing called for under the first factor: if Congress may reasonably conclude that pornography increases the risk of prison rape, then the adverse impact is substantial. Accommodating the right poses a threat to the safety of guards and other inmates. The issue of the allocation of prison resources we take up below; we think the third and fourth factors are strongly interrelated.

The fourth *Safley* factor poses the question whether there are alternatives that can accommodate that right "at *de minimis* costs to valid penological interests." *Safley,* 482 U.S. at 91, 107 S.Ct. 2254. This is not, the Court emphasized, a " 'least restrictive alternative' test." *Id.* at 90, 107 S.Ct. 2254. The most obvious alternative is a detailed prisoner-by-prisoner (and presumably publication-by-publication) sifting to determine whether a particular publication will harm the rehabilitation of a particular prisoner. The costs of this approach seem far from *de minimis.* Apart from the purely administrative burden of such a process, the exercise of such broad discretion seems highly conducive to just the sort of conflicting decisions that give bite to vagueness concerns. And the reality is that prisoners are likely to pass pornographic materials about, so that prisoner-by-prisoner determinations may run aground on the "ripple effect" that the Court mentioned in *Safley,* 482 U.S. at 90, 107 S.Ct. 2254. Even if pornography could be directed only to those not likely to be adversely affected, it could find its way to others, interfering with their rehabilitation and increasing threats to safety.

Of course the flip side of avoiding the costs and hazards of a grant of broad discretion to wardens is the possibility of preventing delivery of materials that, either generally or for a specific set of (effectively segregated) prisoners, pose little or no threat of the harm Congress sought to diminish. Outside prison walls this concern is addressed by the overbreadth doctrine. Here it seems to us captured in part by the demand for a rational relation between the regulation and the goal, and by consideration of alternatives under the fourth "factor." Thus, the objections to a more flexible standard—such as one that would vest discretion in wardens to prevent delivery of materials in any case where in his judgment it would impair a specific prisoner's rehabilitation—go a long way to rebut the claim.

The dissent, nonetheless, seems to regard only such a case-by-case approach as consti-

---

7. Even if there were such a bizarre entitlement, the regulations would still satisfy this factor, as they leave the inmate free to enjoy all written forms of smut not barred by the regulations upheld in *Thornburgh*.

tutional, and makes much of various hypothetical situations in which the categorical ban could unneccessarily exclude certain publications. See Dissent at 210–213. To the extent that these hypotheticals assume direct enforcement of the Ensign Amendment, the likelihood of such enforcement is, as we have noted, quite remote and not before us in this case. Further, the actions of the Bureau of Prisons also suggest that the likelihood of this sort of exclusion under the actual regulatory scheme is remote. The Bureau's Program Statement, for example, listing examples of permissible publications, cites National Geographic; Our Bod[ies], Our Selves; Sports Illustrated (Swimsuit Edition); and the Victoria's Secret Catalog. P.S. 5266.07, at 7. We find it all but impossible to believe that the Swimsuit Edition and Victoria's Secret pass muster while Michelangelo's David or concentration camp pictures fail; nor has there been any suggestion that any prison official has attempted to implement such a bizarre interpretation. As there is no allegation that women in segregated women's prisons are demanding *Playboy,* neither the possibility of such demand nor the Bureau's possible response assists plaintiffs in their overbreadth claim.[8]

Leaving aside these possible fringe applications of the regulation, we again note that the regulation by its terms only restricts pictures; a prisoner may *read* anything he pleases. The dissent's appeal to the value of ideas, pointing by way of example to the vistas opened for Malcolm X by his prison *reading,* see Dissent at 210–211, thus makes little sense here. Congress could, we think, reasonably be skeptical of the proposition that study of the pictures in *Penthouse* would help a prisoner become "an intelligent customer in the marketplace of ideas." If anything, the ban could strengthen the impact of literature by removing the distraction of pictures that in almost every case would be pornographic.

In any event, even under conventional overbreadth doctrine outside of prison, overbreadth claims by those on the margins of pornography have fared poorly. See, e.g., *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 61, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance ... we think this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court.") And regardless of the type of speech at issue, narrow or improbable excesses of a statute are not a ground for invalidation before application shows their reality:

> [W]here a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Even where a statute at its margins infringes on protected expression, "facial invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct....'"

*Osborne v. Ohio,* 495 U.S. 103, 112, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (citations omitted) (ellipses in original). Accordingly, such problems of application can be left to the time when, if ever, they arise.

We find that the statute and regulation satisfy *Safley*'s demand for reasonableness, scoring adequately on all four factors.

\*     \*     \*

Plaintiffs argue that if we are unpersuaded by the district court's analysis we should remand the case to allow them to introduce evidence supporting their position. But that suggestion misconceives the legal issue under *Safley.* The question is not whether curtail-

---

8. To the extent that the Dissent's insistence on individualized determinations turns on a view that general rules with any impact on First Amendment values must correspond to the underlying reason in *every* application, see, e.g., Dissent at 203 (suggesting that government must show that "any pictorial display of nudity or sexual activity communicates messages that are harmful to the rehabilitation of *all* prisoners") (emphasis in original), it asserts a burden that few general rules could satisfy.

ment of pictorial smut *will* advance the prisons' rehabilitative project, but whether Congress could reasonably have believed that it would do so. The studies cited above, coupled with Congress's implicit appeal to ethical norms against the undue stimulation of carnal appetites, indicate the reasonableness of such a belief. If the Bureau of Prisons applies the regulations in a manner that would violate the *Safley* priciples, of course, that would be another case. Accordingly, the district court should have granted the defendants' motion to dismiss plaintiffs' complaint insofar as that complaint rested upon *Safley.*

\* \* \*

■ Besides the overbreadth issue, which we have already addressed in the *Safley* context, plaintiffs have raised two additional theories—excessive vagueness and a claim that the regulations' distinction between pictorial and verbal works is content-based. In fact, the distinction between pictorial and verbal works seems more directed to form than to content, and in any event we have seen that *Safley's* neutrality requirement both displaces conventional First Amendment strictures on content-based limits and is satisfied by these regulations. Although *Safley* may well function as an all encompassing free speech test for the circulation of reading materials in prison, supplanting otherwise applicable First Amendment doctrine, it may be that plaintiffs' vagueness claim has independent force. If it did, of course, the role of the Bureau of Prisons, as manager rather than as law enforcer, might well play an important role in resolution of the claim. Accordingly, as the district court has not addressed these vagueness issues, we remand the case for it to do so. In the meantime, we lift the permanent injunction that it

has imposed on enforcement of the regulations.

*So ordered.*

Wald, Circuit Judge, dissenting:

The prohibition to all federal prisoners of publications "featuring nudity" or depicting "sexually explicit" activities indisputably raises First Amendment concerns. *See, e.g., Reno v. American Civil Liberties Union,* — U.S. —, —, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that sexual expression which is indecent but not obscene is protected by the First Amendment.") (internal quotation omitted); *Martin v. Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (noting that the right of freedom of speech "necessarily protects the right to receive [publications]"). Indeed, if the First Amendment, at its core, is designed to promote the free exchange of ideas, the debate in this case goes to the very heart of its protections. The government argues that the reason all publications featuring nudity or sexually explicit material, whether or not they are pornographic or obscene, should be withheld from *all* federal prisoners is that any pictorial display of nudity or sexual activity communicates messages that are harmful to the rehabilitation of *all* prisoners. Relying on what it claims to be the inherent reasonableness of a legislative judgment that such materials are always inimical to rehabilitation, the government throughout this case has steadfastly resisted creating any kind of record to support such a wide-reaching incursion on the constitutional rights of incarcerated individuals. Today, the majority unquestioningly endorses the government's approach. Because I believe this result sets an unwise and arbitrary precedent that runs contrary to prior case law, I respectfully dissent.[1]

1. I find it very significant that two of our sister courts have recently reached results opposite from that set forth by the majority today. In *Mauro v. Arpaio,* 147 F.3d 1137 (9th Cir.1998), the Ninth Circuit invalidated a county prison system's ban on the possession of all materials containing "any graphic representation of frontal nudity." Although the county claimed that its interests in safety, the rehabilitation of inmates, and the reduction of sexual harassment of guards supported such a ban, the court held that the

county had not "carried its burden to show that such a far reaching prohibition is 'reasonably related' to legitimate penological interests"; in particular, it had "offer[ed] no proof or reasoned explanation" for the ban. *Id.* 147 F.3d at 1142–44. And in *Waterman v. Verniero,* 12 F.Supp.2d 378 (D.N.J. 1998), a district court invalidated a state statute prohibiting inmates in a specialized facility for sex offenders from possessing or obtaining "sexually oriented materials" (defined as any description or depiction of "sexual activity

It appears to need restating once again that prisoners do not lose all their constitutional rights when the prison door clangs behind them. While the prison gate may serve to isolate those inside from the outside world, it does not, as the Supreme Court has taken pains to emphasize, "form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Although the majority pays lip service to this canon, it ignores an important corollary: Whatever sentiments we might hold regarding prisoners for the crimes they have committed, these sentiments must not infect our determination of the prisoners' constitutional rights. Indeed, the Supreme Court has recently reaffirmed, albeit in a different context, that " 'a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.' " *Romer v. Evans,* 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting *Department of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)) (invalidating state constitutional amendment prohibiting official action designed to protect homosexual persons from discrimination). So long as prisoners retain constitutional rights, including First Amendment rights, *see O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("Inmates clearly retain protections afforded by the First Amendment ...."), our duty is to ensure that these rights are not impermissibly curtailed.[2]

It is equally true, however, that the unique and difficult task of running a prison will often necessitate some incursion on inmates' constitutional rights. A prisoner's desire to leave the prison once a week to attend religious services, for example, or his desire to correspond with other inmates may conflict with the prison's need to maintain institutional security. In these instances, courts must give a large measure of deference to the prison administrators who are actively involved in the daily operations of the institution. Courts are not in the best position to judge when or in what manner certain institutional interests may require some action on the part of prison officials to respond to the "complex and intractable" problems of prison administration. *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled in part by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Most of these problems, as the Supreme Court reminds us, "require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id.*

As the majority has duly noted, the Court's standard in *Safley* recognizes the need to forge a balance between the competing interests of prison administration and prisoners' constitutional rights. As I read this standard, it embraces two principles. First, fundamental rights of prisoners must give way to governmental concerns more readily than the fundamental rights of non-

---

or associated anatomical area"; *see Waterman v. Verniero,* 12 F.Supp.2d at 368 (D.N.J.1998) (preliminary injunction)). Despite the state's claim that such materials would disrupt the rehabilitation of sex offenders at the institution, the court held that the state legislature that enacted the ban was motivated by public outrage over pedophiliac crimes rather than rehabilitative interests. *Waterman,* 12 F.Supp.2d at 381–82. Moreover, the court noted, the literature on the effects of such publications was too unsettled to support a finding that a rational relationship existed between the ban and rehabilitative interests. *Id.* In both cases, the courts found the broad scope of the ban, in particular its application to publications featuring nudity, to be unjustifiable in light of any evidence advanced by the government to support it.

**2.** As our Chief Judge has previously noted,

> the special place of prisoners in our society makes them more dependent on judicial protection than perhaps any other group. Few minorities are so "discrete and insular," so little able to defend their interests through participation in the political process, so vulnerable to oppression by an unsympathetic majority. Federal courts have a special responsibility to ensure that the members of such defenseless groups are not deprived of their constitutional rights.

*Doe v. District of Columbia,* 701 F.2d 948, 960 n. 14 (D.C.Cir.1983) (separate statement of Edwards, J.).

prisoners. In adopting a test "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights," *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400, the Court intended to ensure that "courts afford appropriate deference to prison officials," *id.* To require that prison regulations infringing upon fundamental rights undergo strict scrutiny, as they would outside the prison context, would place an inordinately high obstacle in the way of prison administrators' attempts to run their institution safely and efficiently. Second, and significantly, the Court did not intend *Safley*'s lesser standard of review to negate prisoners' constitutional rights altogether, as the majority seems to suggest. The Court did not say, for example, that prison regulations are valid if there is any conceivable basis for their existence, as rational basis review is typically formulated. *See, e.g., United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (noting that where, under rational basis review, "there are plausible reasons for Congress' action, our inquiry is at an end"). Rather, the task for courts is to determine, while giving appropriate deference to the judgment of prison officials, whether a challenged regulation is, in fact, reasonable or whether it is an "exaggerated response" to the "legitimate governmental interest *put forward to justify it.*" *Safley,* 482 U.S. at 89–90, 107 S.Ct. 2254 (emphasis added); *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1445 n.21 (2d ed. 1988) ("Any limit placed on the Court's imagination vis-a-vis legislative purpose must be recognized as a tightened form of scrutiny."). A governmental institution is permitted "regulation more intrusive than what may lawfully apply to the general public," Majority Opinion ("Maj.Op.") at 196, not simply because of its status but rather because of the identifiable, and unique, needs of that institution. And although the need for flexibility is perhaps at its highest in the prison environment, the need for limits on that flexibility is also paramount: Unlike government employees, students, or other participants in governmental institutions, prisoners have no choice about whether to be subject to the power of the state.

To read *Safley*—as the majority appears to—as permitting unblinking deference to any "plausible" legislative judgment about the "rehabilitative" benefits of denying a prisoner's most fundamental constitutional right, *i.e.,* her freedom to read, renders any and all prisoners' constitutional rights a nullity. I had thought it went without saying that courts do not rely on the mere assertion of a regulation's drafters that the regulation is reasonable; to do so would amount to an abdication of our judicial role. *See, e.g., Salaam v. Lockhart,* 905 F.2d 1168, 1171 (8th Cir.1990) ("We would misconstrue [*Thornburgh, O'Lone,* and *Safley* ] if we deferred not only to the choices between reasonable policies made by prison officials but to their justifications for the policies as well."); *Campbell v. Miller,* 787 F.2d 217, 227 n. 17 (7th Cir.1986) ("[D]eference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute."). Nor can the judicial role be diminished to the disappearing point solely because the original decisionmaking body in this case is Congress itself rather than the Bureau of Prisons ("BOP"). *Cf. Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) ("To the extent that the federal parties suggest that we should defer to Congress' conclusion about an issue of constitutional law, our answer is that while we do not ignore it, it is our task in the end to decide whether Congress has violated the Constitution. This is particularly true where the Legislature has concluded that its product does not violate the First Amendment.").[3] The *Safley* standard reconciles prisoners' constitutional rights with institutional needs and defers to prison administrators as the most appropriate articulators of those needs; so long as Congress acts with those same needs in mind, it is entitled to the same deference. But were we simply to defer to Congress's assertion that the Ensign Amend-

---

**3.** Of course, because the majority concludes that the BOP's regulations, and not the Ensign Amendment, are controlling in this case, the majority's focus on Congress's conclusions may be misguided. *See, e.g.,* Maj. Op. at 199 ("It does not matter whether we agree with the legislature, only whether we find its judgment rational."). *But see* note 4, *infra.*

ment ("the Amendment") was reasonably related to the interest asserted, there would be no need for judicial review at all, for no statute infringing on inmates' constitutional rights would fail to satisfy this test. The Court has reminded us that the *Safley* standard "is not toothless," *Thornburgh*, 490 U.S. at 414, 109 S.Ct. 1874 (internal quotation omitted); more precisely, it is not a license for lawmakers, any more than prison wardens, to shortchange the constitutional rights that the Supreme Court has insisted prisoners continue to possess. Only if our assessment is not a cursory one can we give adequate weight to *both* concerns that underlie the *Safley* standard. *See, e.g., Salaam*, 905 F.2d at 1171 n. 6 ("Reasonableness in this context refers not only to the relation between the goals of a regulation and its means, but also to the balance struck between the needs of the prison administrators and the constitutional rights of prisoners.").

It is crucial, therefore, to ensure that although the strictness of our review is lessened, it is not eliminated altogether. Our task, ultimately, is to assess the fit between the interest proffered and the remedy adopted—whether the regulation under consideration is a reasonable means of addressing the legitimate penological interest put forward by the government. In *Safley* itself, for example, although the prison's asserted interests in security and rehabilitation were sufficient to justify *some* restriction on the right to marry, the Court held that the particular restriction adopted was too broad to be upheld. *See Safley*, 482 U.S. at 97–98, 107 S.Ct. 2254 ("No doubt legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry, and may justify requiring approval of the superintendent. The Missouri regulation, however, represents an exaggerated response to such security objectives."); *id.* at 98, 107 S.Ct. 2254 ("[I]n requiring refusal of permission absent a finding of a compelling reason to allow the marriage, the rule sweeps much more broadly than can be explained by petitioners' penological objectives."). In *Thornburgh*, by contrast, the pre-Amendment version of the restrictions under consideration here were found to represent a reasonable response to institutional concerns because the "individualized nature" of the determinations ensured that the policy would not result in "needless exclusions." *Thornburgh*, 490 U.S. at 416–17, 109 S.Ct. 1874; *see also id.* (noting that even a publication that met one of the criteria for exclusion would be rejected "only if it is determined to meet that standard under the conditions prevailing at the institution at the time"). These cases illustrate that the standard of review established by *Safley* sets some limits on the means the government may use to further penological interests. Although these limits are flexible, they are by no means as vaporous as the majority rules them to be.

I agree that rehabilitation is, conceptually, a legitimate governmental interest, even if no one is sure how to achieve it and the Federal Sentencing Guidelines have abandoned it as an attainable goal. *Compare Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) ("[S]ince most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody.") *and Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir.1993) (noting that rehabilitation is a "legitimate objective") *with Kerr v. Puckett*, 138 F.3d 321, 324 (7th Cir.1998) ("Congress abandoned 'rehabilitation' as a justification of imprisonment when it enacted the Sentencing Reform Act of 1984.") *and* S. REP. No. 98–225 (1983), at 38, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221 ("[A]lmost everyone involved in the criminal justice system now doubts that rehabilitation can be induced reliably in a prison setting, and it is now quite certain that no one can really detect whether or when a prisoner is rehabilitated."). Where the majority and I part company is on the ultimate question: Has any "valid, rational connection" between the extremely broad ban on publications featuring nudity or explicit sexual activity and rehabilitation been shown in this case? And while I certainly do not discount the possibility that a ban more narrowly targeted on certain kinds of violent pornography or even on certain types of prisoners might satisfy this requirement, I cannot conclude, on the

present record, that these regulations implementing the Amendment pass muster.[4]

I believe that the determination of whether a regulation (or statute) is reasonably related to a legitimate penological interest must depend, in all but the most obvious cases, on the evidentiary support for that nexus in the record before the court. Of course I recognize too that the question of what or how much evidence is necessary may depend on what logic or everyday experience show us to be the connection between the disputed means and the rehabilitative end. If the Amendment prohibited the distribution of publications containing escape plans, the connection between the ban and the penological interest in institutional security would be obvious, and we could uphold such a prohibition based on little or no demonstrated evidence. Where, as here, however, the connection (between nudity and rehabilitation) is far murkier, courts (and I would include legislators as well) far removed from the day-to-day operations of a prison are much less able to answer the question accurately on their own; indeed, the very reason that *Safley* prescribes a great measure of deference to prison administrators is that they are in the best position to provide answers involving means and ends in prison administration. *See, e.g., Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 713 (9th Cir.1989) ("The principle that courts must provide wide latitude to prison policies needed to maintain institutional order and security necessarily presupposes that the administrators have crafted those policies with careful deliberation.") (citation omitted). We would normally be expected to give a healthy dose of deference to the judgment of prison officials as to their experience and apprehensions in support of a regulation, but where, as in these regulations, these same officials were, so far as we can tell, never consulted on the Amendment's merits and under its terms are not allowed to exercise any judgment about what kinds of nudity or sexually explicit material are allowed inside the prison walls, I do not believe *Safley* permits us simply to assume the existence of evidence showing a connection between the regulation and a rehabilitative goal, as we might under rational-basis review and as the majority has in fact done here.

*Safley* itself provides a useful example of how too Spartan a record can doom a regulation. The Court's rejection of the marriage restriction at issue in that case clearly turned on the quality of the evidence before the Court; four times the Court concluded that the regulation was not reasonably related to penological interests based "on this record." *See Safley,* 482 U.S. at 97, 107 S.Ct. 2254 ("We conclude that *on this record,* the Missouri prison regulation, as written, is not reasonably related to these penological interests."); *id.* at 98, 107 S.Ct. 2254 ("Nor, *on this record,* is the marriage restriction reasonably related to the articulated rehabilitation goal."); *id.* at 99, 107 S.Ct. 2254 ("Moreover, although not necessary to the disposition of this case, we note that *on this record* the rehabilitative objective asserted to support the regulation itself is suspect."); *id.* ("*On this record,* however, the almost complete ban on the decision to marry is not reasonably related to legitimate penological

---

**4.** The majority characterizes Amatel's attack on the Amendment itself as a "pre-enforcement challenge" that is invalid because, in promulgating implementing regulations, the government has "waived certain provisions of the law." Maj. Op. at 195, citing *Salvation Army v. Department of Community Affairs,* 919 F.2d 183, 192 (3d Cir.1990). In contrast to *Salvation Army,* however, we have no "express assurance" that the BOP will not enforce the breadth of the Amendment, *cf. Salvation Army,* 919 F.2d at 192; indeed, the regulations state simply that "publications containing nudity illustrative of medical, educational, or anthropological content *may* be excluded" from the definition of "features," *see* 28 C.F.R. § 540.72(b)(3) (1997) (emphasis added). Moreover, at oral argument, counsel for the BOP acknowledged that under the current regula-

tions, wardens retain considerable discretion as to whether a publication "features" nudity. *See* Tr. of Oral Arg. at 6. The government's "waiver" of certain portions of the Amendment thus cannot be so blithely assumed and may in fact be an impermissible narrowing of the Amendment's mandate. *See, e.g., Public Citizen v. FTC,* 869 F.2d 1541, 1557 (D.C.Cir.1989) ("While agencies may safely be assumed to have discretion to create exceptions at the margins of a regulatory field, they are not thereby empowered to weigh the costs and benefits of regulation at every turn; agencies surely do not have inherent authority to secondguess Congress' calculations."); *Alabama Power Co. v. Costle,* 636 F.2d 323, 358 (D.C.Cir. 1979) ("Categorical exemptions from the clear commands of a regulatory statute, though sometimes permitted, are not favored.").

objectives.") (emphases added). This repeated qualification of the Court's negative conclusion about the validity of the regulation starkly suggests that while a reasonable relationship might possibly have been demonstrated between the marriage restriction and the interests asserted, the prison had failed to present sufficient evidence to establish that relationship.

The majority's apparent conclusion that the government bears no responsibility for compiling evidence to support the breadth of its ban—in other words, that the courts may simply hypothesize a rational connection—runs counter to the wisdom of several other circuit courts. *See, e.g., Shimer v. Washington,* 100 F.3d 506, 509 (7th Cir.1996) (prison administration "must proffer some evidence to support its restriction of ... constitutional rights" under *Safley* standard); *Mann v. Reynolds,* 46 F.3d 1055, 1061 (10th Cir.1995) (invalidating restrictions on contact visits with attorneys, noting that "defendants were unable to provide any evidence the restrictions on contact were reasonably related to prison security"); *Muhammad v. Pitcher,* 35 F.3d 1081, 1085 (6th Cir.1994) (invalidating prison mail regulation because "there is no evidence in the record supporting Defendants' factual claim" that policy was reasonably related to interest in conserving resources); *Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir.1990) ("Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point."); *Waterman,* 12 F.Supp.2d at 373 ("To establish that a legitimate penological interest supports a statute, a state must provide evidence that the interest it proffered is the actual basis for the statute."); *Powell v. Riveland,* 991 F.Supp.

1249, 1254 (W.D.Wash.1997) (upholding restriction on sexually explicit incoming mail where "[p]rior to implementing the policy, research was done on the effects of sexually explicit material and the policy/regulation was written to target those harmful materials"). In sum, it is clear, as Judge Posner has suggested, that the *Safley* analysis cannot be met simply on the basis of "pure conjecture." *Reed v. Faulkner,* 842 F.2d 960, 963 (7th Cir.1988); *see also id.* ("[T]o suppose that the wearing of dreadlocks [as an expression of religious belief] would lead to racial violence is, on this record, the piling of conjecture upon conjecture. The potential infringement of the free-speech clause of the First Amendment is too plain to warrant comment."). *Safley* certainly does not stand for the proposition that Congress or prison officials may "set constitutional standards by fiat." *Whitney v. Brown,* 882 F.2d 1068, 1074 (6th Cir.1989).

I might, therefore, have been able to go along—as the majority does here—with deferring to Congress had the government seen fit to proffer evidence that links a ban on the prohibited publications to rehabilitation or if the connection between that ban and rehabilitation was so self-evident that no further evidence was necessary to demonstrate its reasonableness. But neither event has occurred, and the majority's once-over-lightly of the scientific literature that does exist certainly does not accomplish the task, as the majority itself admits. *See* Maj. Op. at 200 ("The point of this is not to suggest that a causal link has been shown. The array of academic authority on the other side is at least as substantial, and quite possibly more so."). At best, it can be said that a few studies have shown a causative relationship between violent pornography and short-term increases in aggression—perhaps a helpful finding with regard to the security interests of prison authorities but next to useless in determining the effect on any long-term interest in rehabilitation.[5] In all other re-

---

5. Of course, the evidence to support a prison regulation need not be in the form of scholarly studies; affidavits from prison officials could also suffice as the basis for analysis. *See, e.g., Safley,* 482 U.S. at 98, 107 S.Ct. 2254 (testimony of prison officials that they had experienced no

problems with the marriages of male inmates relied on as evidence that ban was overbroad); *Harper v. Wallingford,* 877 F.2d 728, 733 (9th Cir.1989) (finding prison regulation banning receipt of material espousing consensual sexual relationships between male adults and juvenile

spects, the relationship between pornography and criminal activity is merely correlative,[6] and there is no evidence that simply viewing nonpornographic nudity or depictions of sexual activities (as opposed to pornography) has any effect at all.[7] *See, e.g.,* EDWARD DONNERSTEIN, DANIEL LINZ & STEVEN PENROD, THE QUESTION OF PORNOGRAPHY 177 (1987) (stating conclusion of Attorney General's Commission on Pornography that "in general, the scientific evidence shows *no causal* relationship between exposure to [nonviolent and nondegrading sexual] depictions and acts of sexual violence" and noting that the authors' "view of the scientific literature . . . is in agreement with this conclusion"); *id.* at 40–48 (citing studies finding that exposing already angered men to nonviolent pornography can cause a short-term increase in their aggressive tendencies); Ernest D. Giglio, *Pornography in Denmark: A Public Policy Model for the United States? in* 8 COMPARATIVE SOCIAL RESEARCH 281, 285 (Richard F. Tomasson ed., 1985) ("[A] positive causal relationship between pornography and sex crimes has not been documented by criminologists and psychologists."); Berl Kutchinsky, *Obscenity and Pornography: Behavioral Aspects, in* ENCYCLOPEDIA OF CRIME AND JUSTICE 1077, 1083 (Sanford Kadish ed., 1983) (noting that the authoritative studies on the link between pornography and crime have concluded that there is apparently no causative relationship between nonviolent pornography and sex crimes). Indeed, it is unclear even in the studies finding a positive connection between violent pornography and aggressive behavior whether the aggression is due to the violent content of the material or its sexual content. *See, e.g.,* LARRY BARON & MURRAY A. STRAUS, FOUR THEORIES OF RAPE IN AMERICAN SOCIETY 8 (1989) ("It seems reasonable to conclude . . . that it is the violent content rather than the sexual con-

tent that facilitates aggression."); RICHARD A. POSNER, SEX AND REASON 368 (1992) ("[T]he effects [of violent pornography] may be due to the violence per se rather than to the erotic component."). Thus, while it is entirely possible that a narrower publication ban than that accomplished by the Amendment could be supported by the available literature, *cf., e.g., Dawson,* 986 F.2d at 262 (upholding regulation limiting time, place, and conditions under which certain inmates could view materials), neither the government nor the majority has laid the barest foundation for the far-reaching ban promulgated. The majority's level of comfort in relying on any statement of any legislator as to what he thinks will encourage rehabilitation as the sole basis for taking away a First Amendment right is very surprising to me, especially since its holding today goes far beyond what any court has previously condoned in depriving prisoners of constitutional rights on the mere assertion of a legislator that he supposes rehabilitation to be so advanced.

In this respect, I believe that it needs to be stressed that the assertion of "rehabilitation" as the reason for impinging on prisoners' First Amendment rights is particularly disconcerting in its potential for abuse. Unlike its interest in institutional security, the contours of the government's interest in rehabilitation are quite amorphous and ill-defined. At the most basic level, the goal of rehabilitation might be stated as returning the prisoner to society in a state so that he will henceforth behave in a law-abiding manner, but no one, not even Congress, is so immodest as to claim secure knowledge of how this goal is to be achieved in individual cases, let alone in the aggregate; most often, rehabilitation efforts involve therapy, drug and alcohol counseling, basic education, or job training, but even in these positive attempts, the results

---

males to be reasonably related to rehabilitation based on affidavit from prison psychiatrist).

**6.** Correlation cannot be sufficient to satisfy *Safley*'s requirement of a "valid, rational connection." Even if it could be shown, for example, that the majority of those who commit violent crimes are also avid Bible readers, this finding would not constitute a basis for prohibiting all prisoners from reading the Bible.

**7.** By pornography, I mean "a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1767 (1976). There is, of course, much material that features nudity or depicts sexual activity that would not qualify as pornography under any definition, including many highly regarded works of art.

are far from reassuring. Against that backdrop, it is extremely difficult, if not impossible, to ascertain precisely if or how a particular publication may work to frustrate the rehabilitative goals of prisoners. To start with, there is no consensus on whether in order to transform a law violator into a good citizen, he must be "remolded" attitudinally and instilled with desirable values or whether it is sufficient that he be convinced that further criminal activity would be counterproductive in his own case, whatever his vision of society or the world. Rehabilitation may also be viewed—in the majority's parlance—as an effort to direct the "character growth" of prisoners by limiting the reading materials to which he has access. *See* Maj. Op. at 198–199. But, whatever the rehabilitative vision, it should not be possible to proceed on some vague assertion of an interest in "rehabilitation" without the need to define the term or to show a connection between the proscribed activity and the chosen definition; to do so runs an overwhelming risk of overregulation and invasion of the innermost recesses of the human mind and spirit. Indeed, undertaking the Herculean task of "character-molding" is inherently problematic in its First Amendment implications, for it presumably involves casting emerging prisoners in society's own image. This, of course, is the antithesis of First Amendment freedoms; indeed, "[t]otalitarian ideologies we profess to hate have styled as 'rehabilitation' the process of molding the unorthodox mind to the shape of prevailing dogma." *Sobell v. Reed,* 327 F.Supp. 1294, 1305 (S.D.N.Y.1971); *cf., e.g., Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (noting "this Nation's repudiation of the principle that a State might so conduct its schools as to foster a homogeneous people") (internal quotation omitted). Under this theory, lawmakers who believe that books on Russian history may lead to disrespect for the United States may ban those books for prisoners; lawmakers who hold pro-life views may prevent prisoners from reading publications describing *Roe v. Wade;* and lawmakers who hold an antiquated view of the role women should play in society may ban the distribution in prisons of publications with feminist themes. Each of these actions could logically be taken in the name of rehabilitation, broadly defined, and each, without doubt, would contribute to a continual evisceration of the First Amendment rights of prisoners. *Cf., e.g., Stanley v. Georgia,* 394 U.S. 557, 565–66, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds. . . . [I]t cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts."); *McCabe v. Arave,* 827 F.2d 634, 638 (9th Cir.1987) ("Given the strength of First Amendment protection for freedom of belief, prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views.") (citation omitted); *American Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323, 330 (7th Cir. 1985), *aff'd mem.,* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986) ("If the fact that speech plays a role in a process of conditioning were enough to permit governmental regulation, that would be the end of freedom of speech."). These examples may sound extreme—they are—but the majority's rationale easily encompasses them in its umbrella-like authorization for restricting prisoners' reading material on the basis of a minimum plausibility test for tying the censorship to some vague rehabilitation concept.

Even if the goal of rehabilitation is a more modest one—to convince the prisoner his own best interest lies in avoiding future crime—it is hard to see how that goal is furthered by returning him unequipped to be an intelligent customer in the marketplace of ideas. And while serious questions may well be raised about the value of some of the publications banned under the Amendment, there is much that falls under this broad ban that speaks intelligently to mankind, including prisoners: Michelangelo's *David,* for example, or grim photographs of naked bodies piled in the pits of Germany's concentration camps.[8] There is even a potential for such

---

8. The majority suggests that the application of the regulations to prohibit artistic depictions of nudity or to documentary photographs of wartime atrocities would be "bizarre." *See* Maj. Op.

depictions of nudity to strike a life-changing chord with some prisoners, a change that should not be prevented from coming to fruition. Malcolm X wrote of his prison experience:

> I have often reflected upon the new vistas that reading opened to me. I knew right there in prison that reading had changed forever the course of my life. As I see it today, the ability to read awoke inside me some long dormant craving to be mentally alive.... My homemade education gave me, with every book that I read, a little bit more sensitivity to the deafness, dumbness, and blindness that was afflicting the black race in America.

ALEX HALEY & MALCOLM X, THE AUTOBIOGRAPHY OF MALCOLM X 180 (1965).[9]

If rehabilitation is to be deemed a legitimate penological interest, the term must be given some shape, at least when it collides with fundamental liberties. Of course, as the majority notes, the Constitution has nothing to say about what messages the government may choose to communicate as a speaker. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way."). Congress or the BOP may make whatever recreational reading it wishes available in the prison libraries without offending the Constitution; they may even provide each prisoner with a tract on the harms of pornography in the hope that some readers will take its lessons to heart. But it is quite a different matter for prisons to deny all access to certain publications in the name of rehabilitation, particularly in such a broad and over-reaching manner as this one. If prisoners are to retain any First Amendment rights, the mere assertion of "rehabilitation" as the interest to be served by a particular regulation cannot serve to extinguish those rights altogether.

Because the Amendment and the regulations eliminate the discretion of prison wardens to make individual determinations about how particular publications will affect particular prisoners in particular prison settings, even rehabilitatively, I believe it was incumbent upon the government to point to some evidence demonstrating a connection between all publications that are sexually explicit or that feature nudity and a tendency to engage in criminal or disruptive behavior, keeping in mind that our task is to determine whether such a connection is reasonably likely to exist, not whether one might be conceivable. *Cf., e.g., Mauro,* 147 F.3d at 1142–44 (considering whether all materials depicting nudity are "reasonably likely" to cause violence or to be used to harass guards). Neither the government nor the majority has pointed to any such evidence.

Indeed, the proposition that all material that is sexually explicit or that features nudity will have a detrimental effect on rehabilitation is belied by the prior actions of the prison officials under the pre-Amendment policy. At that time, prison officials were authorized to prohibit sexually explicit materials that they believed would negatively affect the discipline or "good order" of the institution. Significantly, the prison officials—to whose expertise the Supreme Court has repeated deferred on matters such as this—did not choose to prohibit all material that is sexually explicit or that features nudity. Rather, they evaluated the publications

---

at 201–202. But, in fact, even the regulations do not provide for any exceptions to the nudity ban based on a publication's artistic or political content. *See* 28 C.F.R. § 540.72(b)(3) (providing possible exception only for nudity "illustrative of medical, educational, or anthropological content"). And although the Victoria's Secret catalog and the *Sports Illustrated* Swimsuit Edition are listed by the BOP as permissible publications, the basis for their exclusion from the ban is left to conjecture. *Cf. id.* § 540.72(b)(2) (defining "nudity" as "a pictorial depiction where ... female breasts are exposed"). As for the notion that explicit descriptions of sexual activities and nudity are still permitted (an illustrated version of Henry Miller's *Tropic of Cancer* is banned but a nonillustrated version is not), this only underscores the arbitrariness of the rehabilitative nexus.

9. Of course, lawmakers who believe that Malcolm X inspires separatism and racial consciousness may, under the "remolding" theory of rehabilitation, prohibit prisoners from reading his writings as well.

individually to determine which ones, in their expert opinions, posed a potential threat and which did not; indeed, as the majority notes, "explicit heterosexual material" was ordinarily admitted. *See Thornburgh*, 490 U.S. at 405 n. 6, 109 S.Ct. 1874 (quoting Program Statement 5266.5(b)(2)). It was this "individualized nature" of the determinations that led the *Thornburgh* Court to conclude that the regulations at issue in that case were rationally related to security interests, the nature of which, like rehabilitation, can change over time.[10] *See Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874 ("We agree that it is rational for the Bureau to exclude materials that ... are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time.").

Because I believe that, on this record, there is no basis for concluding that there is a rational connection between the interest asserted by the government—rehabilitation—and the restriction chosen to further that interest—a ban on the delivery to all federal prisoners of all publications that are sexually explicit or that feature nudity, I would affirm the decision of the district court. As the majority considers the remaining *Safley* factors, however, I will also offer a few thoughts.

The second *Safley* factor considers whether there are "alternative means of exercising the right that remain open to prison inmates." *Safley*, 482 U.S. at 90, 107 S.Ct. 2254. Although this right must be viewed "sensibly and expansively," *Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874, it cannot be viewed so broadly as to eliminate any reason for analysis (or as unhelpfully as the majori-

ty's sardonic reference to an "entitlement to smut"). The *Thornburgh* Court, for example, noted that although the regulation under consideration in that case permitted the warden to make individualized determinations as to each publication, an exercise of discretion that might appear to produce inconsistent results, "greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications," which "might itself run afoul of the second [*Safley*] factor." *Id.* at 417 n. 15, 109 S.Ct. 1874. Because the Amendment eliminates a wide variety of publications that feature nudity for artistic or other reasons, prisoners do not have sufficient means of exercising their right to receive many constitutionally protected materials. *Cf., e.g., Mauro*, 147 F.3d at 1144 ("[I]n direct contradiction of the Supreme Court's cautionary language in *Thornburgh*, Maricopa County has enacted a regulation that sweeps too broadly, indiscriminately eliminating large categories of materials without individualized consideration.").

The third factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates." *Safley*, 482 U.S. at 90, 107 S.Ct. 2254. Where the institutional interest asserted for a publication ban is security, accommodation of the inmate's First Amendment rights may indeed cause the "ripple effect" of which the *Safley* Court warned, *see id.*; a breach of security with respect to one prisoner is likely to result in other breaches in the prison. In this case, however, there is no evidence by which to judge whether permitting certain inmates to view publications that are sexually

---

**10.** It should be noted in this respect that a seemingly innocuous publication may be quite detrimental to a prisoner's rehabilitation, depending on the circumstances. *See, e.g., Waterman*, 12 F.Supp.2d at 367–68, 368–69 (citing concerns of prison officials that pictures of children from the Sears catalog should not be seen by pedophile prisoners).

The need for individualistic determinations when behavior modification is at stake was also a concern in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), in which the Court upheld a prison policy that permitted the involuntary administration of antipsychotic drugs to inmates, given that the policy

was not unnecessarily broad and supported by a wealth of evidence:

> Its exclusive application is to inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others. The drugs may be administered for no purpose other than treatment, and only under the direction of a licensed psychiatrist. There is considerable debate over the potential side effects of antipsychotic medications, but there is little dispute in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior.

*Id.* at 226, 110 S.Ct. 1028.

explicit or that feature nudity will have an adverse effect on the *rehabilitation* of other inmates. Rehabilitation is a gradual process, and it is entirely possible that any momentary lapses caused by the inadvertent receipt of an inappropriate publication may be reversed with additional rehabilitative efforts. This is not true of security breaches: Once an inmate has received information on how to escape from the prison, he cannot be made to forget it. It thus cannot be concluded, on this record, that accommodation of Amatel's First Amendment right will have a significant effect on the rehabilitation of other inmates.

Finally, the fourth factor considers whether there are "obvious, easy alternatives" that "fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests"; if so, this may be evidence that the regulation is an "exaggerated response" to prison concerns. *Id.* at 90–91, 107 S.Ct. 2254. One such alternative comes immediately to mind: the preAmendment policy, under which wardens had discretion to examine each incoming publication and determine whether institutional interests favored its prohibition. The Court's approval of this policy in *Thornburgh* eliminates any concerns the majority might have that such a policy would be deemed arbitrary or particularly burdensome; indeed, since prison officials under the current policy must examine each publication to determine whether it is sexual-

ly explicit or features nudity, the prior policy arguably represents no additional administrative burden.

Moreover, other aspects of the Amendment suggest that it is indeed an "exaggerated response" to rehabilitative concerns. The Amendment does not allow the warden to take into account whether a prisoner is in a high- or low-security institution, whether a prisoner is male or female, what kinds of crimes the prisoner has committed,[11] the nature of the prisoner's sentence,[12] how long the prisoner has been incarcerated and how long he or she has left to serve, whether the prisoner is receiving rehabilitative treatment,[13] or even whether a prisoner is in a prison environment that provides an opportunity to share the material with anyone else (particularly with other prisoners convicted of sex crimes). In these respects, the Amendment "sweeps much more broadly than can be explained by [the government's] penological objectives." *Safley*, 482 U.S. at 98, 107 S.Ct. 2254 (invalidating ban on all prisoner marriages by noting that prison officials had experienced no problems with marriages by male inmates or with inmate civilian marriages; the prison's rehabilitative concern "appear[ed] from the record to have been centered almost exclusively on female inmates marrying other inmates or exfelons," *id.* at 99, 107 S.Ct. 2254, and thus did not account for the ban on other inmate marriages).

11. For example, the government has provided no evidence on why a ban on nudity is necessary to rehabilitate those convicted of nonsexual and/or nonviolent crimes. I can think of no reason why an embezzler, a tax evader, or a person held in contempt for refusing to testify will be rehabilitated if prevented from looking at publications that "feature" nudity. (The statements of the only two members of Congress who offered floor comments on the Amendment suggest that their concern was with sex offenders. *See* 142 Cong Rec. H8262 (daily ed. July 24, 1996) ("[I]f we do not adopt my amendment, we are sending the message that it is OK to provide sexually explicit magazines and books to the very prisoners who have committed violent acts against women.") (statement of Rep. Ensign); *id.* ("Far too often, those individuals convicted of crimes have the opportunity, while in prison, to use materials that glamorize the very acts for which they were convicted.") (statement of Rep. Christensen).)

Moreover, the Amendment's ban may also extend to those inmates who have not yet been

convicted but rather are imprisoned while awaiting trial. The government has not suggested any reason for it to take a rehabilitative interest in these individuals, nor do I think it can legitimately do so. *See, e.g., McGinnis v. Royster,* 410 U.S. 263, 273, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973) ("[I]t would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence.").

12. The government would seem to have less rehabilitative interest in, for example, prisoners who have been sentenced to life in prison without parole or to death.

13. In some prisons, material featuring adult nudity is an effective part of a rehabilitative program. *See, e.g, Waterman,* 12 F.Supp.2d at 370–71 (citing evidence that adult pornography may be helpful in turning pedophiles away from child pornography).

The majority's decision to remand this case for further consideration of Amatel's vagueness challenge leaves a scintilla of hope that this ill-conceived statute will ultimately fail. Because I cannot agree with the majority's *Safley* analysis, however, or with its decision to lift the district court's injunction in the interim, I respectfully dissent.

### CONCLUSION

Justice Holmes once remarked that hard cases make bad law. *See Northern Sec. Co. v. United States,* 193 U.S. 197, 400, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). Claims of prisoners to read magazines like *Playboy* or *Penthouse* may not be the ideal vehicles for the articulation of First Amendment rights. But, as Dostoyevsky observed, "the degree of civilization in a society is revealed by entering its prisons." F. DOSTOYEVSKY, THE HOUSE OF THE DEAD 76 (C. Garnett trans., 1957). Today's ruling that prisoners may be stripped of rights to view publications of their choice on the mere assertion of legislators or regulators—far removed from the prison scene and without supporting evidence of any kind—that those publications will hinder their "rehabilitation" goes well beyond prior precedent and the case law in other circuits. It is a most troubling precedent.