Richard WATERMAN, et al., Plaintiffs,

v.

John FARMER, Jr., et al., Defendants.

Civil Action No. 98–1938 (AMW).

United States District Court,
D. New Jersey.

March 1, 2000.

Lawrence S. Lustberg, Mark A. Berman, Gibbons, Del Deo, Dolann, Griffinger & Vecchione, PC, Newark, NJ, for Plaintiffs.

John J. Farmer, Jr., Attorney General of New Jersey, by Stephen D. Bird, Deputy Attorney General, Trenton, NJ, for Defendants.

## OPINION

PISANO, District Judge.[1]

Before the court is an application by plaintiffs, Richard Waterman and Michael Curtis, for attorney's fees and costs pursuant to 42 U.S.C. § 1988. Defendants filed opposition, and the Court decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, plaintiffs' application is denied.[2]

### *Background*

This matter arises from a civil rights action filed pursuant to 42 U.S.C. § 1983 in May 1998 by two prisoners incarcerated at the Adult Diagnostic and Treatment Center (the "ADTC") in Avenel, New Jersey. The ADTC is a facility with the sole purpose of housing and rehabilitating sex offenders, such as pedophiles, rapists and child molesters, whose behavior has been deemed to be repetitive and compulsive. Plaintiffs' suit challenged the constitutionality of a New Jersey statute, *N.J.S.A.* 2C:47–10, which bans any "sexually oriented and obscene materials" from the ADTC. The statute reads as follows:

 a. As used in this act, "sexually oriented material" means any description, narrative account, display, or depiction

---

1. The undersigned was confirmed as a U.S. District Judge on February 16, 2000. However, since the reference of this motion was made prior thereto, this opinion is being entered in my capacity as a United States Magistrate Judge pursuant to 28 U.S.C. § 636. Accordingly, the parties' right to appeal shall be governed by Local Civil Rule 72.1.

2. The denial of this motion for fees presents some degree of irony, in that this Court assigned counsel to plaintiffs based, in part, on the arguable merit of their constitutional claims. *See Waterman v. Verniero,* No. 98–1938 (D.N.J. May 21, 1998). The ruling on this fee application should in no way detract from counsel's commendable effort in this action.

of sexual activity or associated anatomical area contained in, or consisting of, a picture or other representation, publication, sound recording, live performance, or film.

b. An inmate sentenced to a period of confinement in the Adult Diagnostic Treatment Center shall not receive, possess, distribute or exhibit within the center sexually oriented material, as defined in subsection a. of this section. Upon the discovery of any such material within the center, the commissioner shall provide for its removal and destruction, subject to a departmental appeal procedure for the withholding or removal of such material from the inmate's possession.

c. The commissioner shall request an inmate sentenced to confinement in the center to acknowledge in writing the requirements of this act prior to the enforcement of its provisions. Any inmate who violates the provisions of subsection b. of this section shall be subject to on-the-spot sanctions pursuant to rules and regulations adopted by the commissioner.

d. A person who sells or offers for sale the material prohibited in subsection b. either for purposes of possession or viewing or who receives, possesses, distributes or exhibits any text, photograph, film, video or any other reproduction or reconstruction which depicts a person under 18 years of age engaging in a prohibited sexual act or in the simulation of such an act as defined in section 2 of P.L.1992, c. 7 (C.2A:30B–2), within the center shall be considered to have committed an inmate prohibited act and be subject to sanctions pursuant to rules and regulations adopted by the commissioner.

N.J.S.A. 2C:47–10.

In July of 1998, after preliminarily enjoining enforcement of the statute, *see Waterman v. Verniero,* 12 F.Supp.2d 364 (D.N.J.1998), the District Court found N.J.S.A. 2C:47–10 to be unconstitutional and permanently enjoined its enforcement. *See Waterman v. Verniero,* 12 F.Supp.2d 378 (D.N.J.1998) (*"Waterman II"*). The court held in *Waterman II* that the measure was both (1) unconstitutionally overbroad and vague; and (2) not rationally related to a valid penological interest. *Id.* In particular, the Court held that the statute

> [a]s currently written … sweeps far too broadly because it prohibits plaintiffs from reading the Bible, fashion magazines, books, legal documents, and sections of newspapers. In addition, the statute is vague because it fails to define "associated anatomical area." That phrase indicates that the statute bans the inmates from possessing or obtaining materials describing or depicting sexual activities from kissing to intercourse.

12 F.Supp.2d 378, 380.

Defendants appealed the ruling of the District Court, and on June 30, 1999, the Court of Appeals for the Third Circuit reversed, finding that the plaintiffs' constitutional claim lacked merit. *See Waterman v. Farmer,* 183 F.3d 208 (3d Cir.1999) (*"Waterman III"*).

Subsequent to oral argument on appeal but approximately two months before the final decision was rendered by the Third Circuit, the state of New Jersey published proposed rules clarifying the scope of the challenged statute. *See* 31 *N.J. Reg.* 918(a). On June 21, 1999, these rules became effective as regulations. *See* 31 *N.J. Reg.* 1615(a); *N.J.A.C.* 10A:18–9.1 *et seq.* Among other things, these regulations contain definitions of "sexually oriented material," "associated anatomical area," and "sexual activity." *N.J.A.C.* 10A:18–9.1 The regulations further narrow the scope of the statute by providing that:

> (b)Materials containing a depiction or description of sexual activity or an associated anatomical area shall not be considered "sexually oriented" unless the

material is predominantly oriented to such depictions or descriptions.

(c) A newspaper, magazine or other similar publication shall not be considered predominantly oriented to the depiction or description of sexual activity or associated anatomical area unless the publication features or contains such descriptions or displays on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues.

*N.J.A.C.* 10A:18–9.2

■ Shortly after their initial success on the merits of their claims at trial, plaintiffs made an application to the Court for an award of attorney's fees pursuant to 42 U.S.C. § 1988. The decision on that application was held pending the outcome of defendants' appeal. After the reversal in *Waterman III* by the Third Circuit, plaintiffs renewed their attorney's fees application. Plaintiffs argue that although they ultimately failed to obtain a judgment on the merits in their favor, their lawsuit was the "catalyst" that prompted New Jersey officials to promulgate regulations clarifying the statute's scope. Under the judiciallycreated catalyst doctrine, attorney's fees are recoverable under § 1988 when a lawsuit "act[s] as a catalyst" prompting a defendant "to take action" that brings the plaintiff "some of the benefit sought" in bringing the action. *NAACP v. Wilmington Med. Ctr., Inc.*, 689 F.2d 1161, 1167 (3d Cir.1982). Defendants, on the other hand, argue that plaintiffs are not entitled to an award of fees because (1) the Prison Litigation Reform Act of 1995 ("PLRA"), 42 specifically U.S.C. § 1997e(d), abrogates the catalyst doctrine in the context of prisoner litigation; (2) the Court of Appeals never held that N.J.S.A. 2C:47–10 would be unconstitutional absent the regulations; and (3) the state had contemplated and moved toward the enactment of such regulations prior to plaintiffs filing their complaint.

## Discussion

### A. Attorney's Fees Under 42 U.S.C. § 1988

"The predicate to an award of attorney's fees under 42 U.S.C. § 1988 is that a party must have been 'prevailing.'" *Baumgartner v. Harrisburg Housing Auth.*, 21 F.3d 541, 544 (3d Cir.1994). Section 1988 provides in the pertinent part that "[i]n any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.

■ The determination as to whether a party is prevailing under § 1988 involves a two-step inquiry. *See Wheeler v. Towanda Area School Dist.*, 950 F.2d 128, 131 (3d Cir.1991); *J.C. v. Mendham Twp. Bd. of Educ.*, 29 F.Supp.2d 214, 219 (D.N.J.1998). The first step is a determination of whether a plaintiff achieved relief on any of his or her claims. *Wheeler*, 950 F.2d at 131. This has been described a "commonsense comparison between the relief sought and obtained." *Id.* It is not a requirement that a plaintiff secure a favorable judgment on the merits in order to be deemed a prevailing party; it is sufficient that he or she "succeed on any significant issue in the litigation which achieves some benefit ... sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The second part of the inquiry requires that there be a causal link between the lawsuit and the relief ultimately obtained by the plaintiff. *Wheeler*, 950 F.2d at 132; *Mendham Twp. Bd. of Educ.*, 29 F.Supp.2d at 219. In other words, in a case such as the present one in which plaintiffs did not ultimately succeed on the merits of their claim, "the pressure of the lawsuit" must have been "a material contributing factor" in bringing about the events that resulted in obtaining extrajudicial relief. *Id.* This is generally referred

to as the "catalyst" theory.[3] *See Baumgartner*, 21 F.3d at 544; *See also Clark v. Township of Falls*, 890 F.2d 625, 627 (3d Cir.1989) ("[I]f plaintiffs could establish that their suit was the catalyst for the changes, they were entitled to prevailing party status despite the fact that the district court had ruled against them.")

With the above considerations in mind, the issue before this Court in determining whether an award of attorney's fees is appropriate in the present case is twofold; (1) whether plaintiffs are prevailing parties under the catalyst test; and, if so, (2) whether the PLRA nonetheless bars such an award by abrogating the catalyst theory in the prison-litigation context.

■ Plaintiffs claim that they "achieved essentially all of the relief sought in their lawsuit" because it was not until well after they prevailed in the District Court that the state enacted regulations "narrowing the ambiguous terms of N.J.S.A. 2C:47–10." (Pl. Brief at 7). Indeed, despite an assertion by defendants that the State contemplated the adoption of such regulations more than two months prior to plaintiffs filing their complaint, it is apparent that this lawsuit was a material factor in prompting the state to issue regulations at the time it did so. Plaintiffs argued from the outset of this litigation that the State should have enacted regulations narrowing the scope of N.J.S.A. 2C:47–10. *See, e.g.,* Dist. Ct. Tr. at 37 ("[T]his would be a different case if Your Honor had before you not only this statute but some sort of implementation regulations that define these terms carefully.") Defendants' position, at least initially, was that regulations were unnecessary because the statute would not be enforced in an "unrealistic" manner. (Dist. Ct. Tr. at 15) On appeal, defendants also argued that because the District Court acted hastily in striking down the statute, the State did not have the opportunity to establish regulations governing the implementation of the statute.[4] (Appellant Br. at 47)

Despite the assertion by defendants in *Waterman III* that the district court's "haste to strike down" the measure prevented the state from enacting clarifying regulations, defendants have not even alleged that the State was *actively* engaged in the promulgation of such regulations at the time plaintiffs filed their action. Defendants indicate that the State "began considering adopting regulations" and Commissioner Jack Terhune approved the drafting of regulations prior to this lawsuit, *see* Def. Opp. at 11; however, there is no indication that a continuing effort was taken toward promulgating any regulations until the lawsuit prompted such action. Indeed, the defendants' position at oral argument before the Court of Appeals in January of 1999 seems to indicate the same:

> THE COURT: I still don't understand why you don't have that opportunity [to establish regulations]? Why can you not issue regulations or an informal administrative interpretation that would go into effect if the injunction against enforcement of the statute were lifted?
>
> [DEFENDANTS]: Well, when we go back to Trenton today we will give some thought to doing that.

Third Cir. Tr. at 19.

Accordingly, the Court concludes that plaintiffs' lawsuit was a material contribut-

---

**3.** Although the Circuits are divided as to the continuing validity of the catalyst theory in light of the Supreme Court's decision in *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (finding that a party prevails in litigation "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff"), *see Friends of the Earth, Inc. v. Laidlaw Environmental Svcs.,*

120 U.S.693, ——, 120 S.Ct. 693, 699, 145 L.Ed.2d 610 (2000), it is still a viable basis for obtaining attorney's fees in the Third Circuit. *See Baumgartner v. Harrisburg Housing Auth.,* 21 F.3d 541, 550 (3d Cir.1994)

**4.** N.J.S.A. 2C:47–10 was signed into law on January 19, 1998. The District Court temporarily enjoined the State from enforcing the statute on June 1, 1998.

ing factor in prompting the State to adopt regulations narrowing the scope of N.J.S.A. 2C:47–10. However, this is only of significance to plaintiffs' fee application if the situation were such that without these regulations, N.J.S.A. 2C:47–10 would be unconstitutional. Said another way, plaintiffs' lawsuit cannot be said to be the catalyst "motivating defendants to provide the primary relief sought" unless the statute was unconstitutional absent the regulations implementing it. If the statute was valid without the regulations, plaintiffs cannot be considered to be the prevailing party under the catalyst test.

In *Waterman III*, the Third Circuit Court of Appeals examined the constitutionality of the challenged statute. The District Court in *Waterman II* concluded that statute was vague and overbroad, and as a result, it was unconstitutional regardless of whether it was rationally related to a legitimate penological interest under *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). *See Waterman II*, 12 F.Supp. at 381. The Court of Appeals, however, disagreed with the District Court's conclusion that it could declare the statute unconstitutional without first considering whether it was rationally related to a legitimate penological interest under *Safley*. *See Waterman III*, 183 F.3d at 212. Accordingly, the Third Circuit applied the fourpart test enunciated in *Safley* to make the determination as the statute's constitutionality.

Ultimately, the Court of Appeals held that the statute passed constitutional muster on its own. *See id.* at 220. The court in *Waterman III* never expressly declared that the regulations were necessary for the statute to withstand the constitutional challenge, although it is arguable that the regulations played a role in shaping the court's decision, *see, e.g., Waterman III*, 183 F.3d at 209 ("Subsequent to the Dis-

trict Court's decision, the state adopted regulations clarifying the statute's scope." *Informed by these regulations*, we hold that the plaintiff's constitutional challenge lacks merit . . . .) (emphasis added). The existence of such regulations presented the Third Circuit with somewhat of a different case than the District Court had decided, and further, nullified potentially meritorious arguments plaintiffs put forth on appeal. For example, under the first prong in the *Safley* analysis, the Third Circuit considered whether the statute "bears a 'valid, rational, connection' to a legitimate governmental objective." *Id.* at 214 (quoting *Safley*, 482 U.S. at 89–90, 107 S.Ct. 2254). In its discussion of the last requirement of *Safley's* first prong, namely, whether there is a logical connection between the statute and its asserted goal, the Third Circuit followed the analysis set forth by the D.C. Circuit in a factually similar case, *Amatel v. Reno*, 156 F.3d 192 (D.C.Cir.1998), and concluded New Jersey legislature acted rationally in enacting the N.J.S.A. 2C:47–10. Plaintiffs attempted to distinguish *Amatel* by pointing out that the statute which was upheld in *Amatel* is not enforced directly, but instead is enforced pursuant to "regulations defining the terms of the proscription and significantly narrowing its scope." *Waterman*, 183 F.3d at 217. The court found that "[p]laintiff's attempt to distinguish *Amatel* fails," because "[w]hatever force this argument carried prior to the issuance of the new implementing regulations, we see no basis for this argument now. . . . New Jersey has now promulgated regulations 'defining the terms and proscription and significantly narrowing [the statute's] scope.'" *Waterman*, 183 F.3d at 218 (quoting *Amatel*, 156 F.3d at 194) (alteration in the original).

The effect of the regulations was also noted in the Third Circuit's analysis of *Safley's* second factor, namely, whether an alternative means of exercising the right at stake is available. The Circuit Court, citing *Thornburgh v. Abbott*, 490 U.S. 401,

417, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (holding that the relevant right must be viewed sensibly and expansively) disagreed with the District Court's conclusion that the statute was broad enough to forbid prisoners from reading the Bible and other non-pornographic books. The Third Circuit then noted that

> [e]ven if we were inclined to reach the opposite conclusion, the recently promulgated regulations implementing the statute would foreclose any need for us to do so. As noted, the regulations significantly narrow the statute's broad scope by defining many of its operative terms.... Thus the regulations eliminate any concern that Plaintiffs will be left without alternative means of exercising their constitutional rights.

*Waterman*, 183 F.3d at 219.

Unfortunately for plaintiffs, even though the Court of Appeals recognized the effect the regulations had on narrowing the scope and effect of the statute, a careful reading of the decision in *Waterman III* shows that the court found N.J.S.A. 2C:47–10 was constitutional on its own. This being so, despite the fact that plaintiffs' lawsuit was a material factor in the implementation of the regulations, it cannot be said that the plaintiffs achieved any of the relief they sought. Accordingly, plaintiffs cannot be considered "prevailing parties" for the purposes of an award of attorney's fees under § 1988.

*B. Prison Litigation Reform Act*

 Even if the Court were inclined to read *Waterman III* in the light most favorable to plaintiffs and find that the regulations were a determining factor in preserving the statute's constitutionality, plaintiffs' application still must fail. The present fee application relies upon the judicially-created catalyst doctrine to assert that plaintiffs have prevailed within the meaning of § 1988. Defendants, on the other hand, argue that the PLRA governs the plaintiffs' fee application rather than the catalyst doctrine, and that under the

PLRA, plaintiffs are not eligible for an award of attorney's fees.

"Congress enacted [the] PLRA with the principal purpose of deterring frivolous prisoner litigation by instituting economic costs for prisoners wishing to file civil claims." *Hernandez v. Kalinowski*, 146 F.3d 196, 200 (3d Cir.1998). To that end, it created a system of "monetary and procedural disincentives to the filing of meritless cases." *Christiansen v. Clarke*, 147 F.3d 655, 658 (8th Cir.1998). Among other things, the PLRA modifies the application of § 1988 to prisoner civil rights suits and provides more stringent limitations on both the availability and the amount of fee awards. *See* 42 U.S.C. § 1997e(d). With respect to the present application for attorney's fees, the PLRA states in the relevant part:

> (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—
>
> (A) the fee was directly and reasonably incurred *in proving an actual violation of the plaintiff's rights* protected by a statute pursuant to which a fee may be awarded under section 1988 of this title....

42 U.S.C. § 1997e (d)(a) (emphasis added).

Few courts have examined the framework for analyzing fee applications in prisoner civil rights cases, and the parties have not cited, nor has the Court found, any cases which address the specific issue *sub judice*, namely, whether the judicially-created catalyst doctrine continues to apply in prisoner civil rights cases in light of § 803(d) of the PLRA. This Court concludes that it does not.

Plaintiffs argue that the proper analysis in determining a fee award in prisoner civil rights cases is set forth in *Walker v. Bain*, 65 F.Supp.2d 591, 597 (E.D.Mich.1999) as follows:

First, the court should determine whether plaintiff is eligible for an award of attorney fees by determining whether he is a prevailing party under § 1988.

Second, the court should calculate the lodestar method in the ordinary fashion. In making this calculation, however, the court must: (a) limit the hourly rate sought to the lesser of the prevailing market rate (normally applied under § 1988) or the maximum provided in § 1997e(d)(3); and (b) limit the hours sought to only those hours which were "directly and reasonably incurred in proving an actual violation of the plaintiff's rights" as required by § 1997e(1)(A).

Third, the court should determine whether the amount of the fee determined from the first two steps is proportionate to the relief obtained under § 1997e(d)(1)(B).

Plaintiffs' Reply at 2–3 (citing *Bain* and omitting fourth step not relevant to this case). Under this analytical framework, plaintiffs take the position that the PLRA has no bearing on the initial inquiry under the first prong, namely, whether a prisoner is entitled to fees at all. Rather, plaintiffs argue that "the PLRA simply limits the amount of fees a prevailing party can recover...." *Id.* at 3.

The Court does not take issue with the *Bain* analysis; however, plaintiffs err in their application of the first prong. In making the determination as to whether a plaintiff is "prevailing", § 1988 must be read in conjunction with the PLRA. In doing so, it is clear that the PLRA conditions an award of attorney's fees in prisoner civil rights suits on a determination that a plaintiff's rights have actually been violated, thereby abrogating the judicially-created catalyst doctrine.

The Court notes that under the normal rules of statutory construction, if Congress intends for legislation to change the interpretation of a judicially-created concept, it makes that intent specific. *See Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.... Thus, where a common-law principle is well established ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.") Indeed, both the plain language of the PLRA and its legislative history demonstrate Congress' intent to eliminate the catalyst theory in prisoner civil rights cases. In the Judiciary Committee's report on an earlier House version of the PLRA, the Committee noted that

This subsection [on attorney's fees [5]] permits prisoners challenging prison conditions under 42 U.S.C. § 1983 to receive attorney fees but reasonably limits the circumstances under which fees may be granted as well as the amount of the fees.

This subsection [on attorney's fees] limits awards of attorney fees in two ways. First, it narrows the judicially-created view of a "prevailing party" so that a prisoner's attorney will be reimbursed only for those fees reasonably and directly incurred in proving an actual violation of a federal right. Narrowing the definition of "prevailing party" will eliminate both attorney fees that penalize voluntary improvements in prison conditions and attorney fees incurred in litigating unsuccessful claims, regardless of whether they are related to meritorious claims. While this provision eliminates the financial incentive for prisoners to

---

5. (f) Attorney's Fees.-No attorney's fee under section 722 of the Revised Statutes of the United States (42 U.S.C.1988) may be granted to a plaintiff in a civil action with respect to prison conditions except to the extent such fee is-

(1) directly and reasonably incurred in proving an actual violation of the plaintiff's Federal rights....
H.R.Rep. No. 21, 104th Cong., 1st Sess. 1995, 1995 WL 56410 (H.R. 667, Section 301)

include numerous non-meritorious claims in sweeping institutional litigation, it retains the financial incentive to bring lawsuits properly focused on prison conditions that actually violate federal law. Second, this provision has the effect of reducing attorney fee awards by eliminating fees for litigation other than that necessary to prove a violation of a federal right.

H.R.Rep. No. 21, 104th Cong., 1st Sess. 1995, 1995 WL 56410

Further evidence of Congress' intent to remove the catalyst theory can be found in the Congressional Record. After introducing S. 1275, an earlier version of the PLRA which also allowed the recovery of attorney's fees only if "the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights . . . ," the bill's chief sponsor commented as follows:

> [P]risoners no longer will be reimbursed for attorney's fees unless they prove an actual statutory violation. No longer will courts award attorney's fees simply because the prison has changed pre-existing conditions. Only if the conditions violated a prisoner's rights will fees be awarded. Prisoners who succeed in proving a statutory violation will be reimbursed only for fees directly and reasonably incurred in proving that violation.

141 Cong. Rec. S14317 (September 26, 1995) (statement of Senator Abraham).

It is clear from the plain language of the PLRA and from its legislative history that the catalyst theory is no longer applicable for fee awards in prisoner civil rights claims. Under the statute, the Court cannot award fees in prisoner civil rights cases unless "the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights. . . ." 42 U.S.C. § 1997e(d)(1). In the present case there was no such determination. Accordingly, plaintiffs are not entitled to an award of fees.

## C. Equal Protection

Plaintiffs argue that the Court's construction of the PLRA demonstrates that the statute unconstitutionally discriminates against prisoner civil rights litigants. Specifically, plaintiffs allege the statute violates the Equal Protection Clause of the Fifth Amendment of the United States Constitution because it irrationally discriminates between similarly situated prisoner and non-prisoner civil rights litigants. The Court disagrees.

Plaintiffs concede that their equal protection challenge to the PLRA is governed by rational basis review. *See Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("If a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relationship to some legitimate end.") *See also Madrid v. Gomez,* 190 F.3d 990, 996 (9th Cir.1999)(applying rational basis review to equal protection challenge to PLRA); *Bain,* 65 F.Supp.2d at 600 (same). Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In an equal protection analysis, rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Rather, a court must uphold a measure "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller,* 509 U.S. at 320, 113 S.Ct. 2637. The person challenging the legislation bears the burden "to negative every conceivable basis which might support it, . . . whether or not the basis has a foundation in the record." *Id.* at 320–21, 113 S.Ct. 2637. Plaintiffs have not met this burden.

Courts have recognized that the general purpose of the PLRA is to curtail frivolous lawsuits by prisoners and minimize the costs, borne by taxpayers, associated with such suits. *See Madrid,* 190 F.3d at 996. The limitation on the availability of fee awards is consistent with the goals of curtailing such suits and protecting the public fisc. Plaintiffs do not dispute the legitimacy of these governmental interests, rather they contend that these interests are not rationally related to the distinction drawn between prisoners and all other litigants with respect the abrogation of the catalyst doctrine. The Court, however, finds a rational relationship between the two.

It has been generally noted that prisoners file a disproportionate number of frivolous lawsuits because of "potential gains and low opportunity costs." *See, e.g., Rodriguez v. Cook,* 169 F.3d 1176, 1181 (9th Cir.1999). It is conceivable that Congress was concerned that a broad definition of "prevailing party" financially encouraged prisoners to bring sweeping actions which included claims with little likelihood of success. By requiring plaintiffs to prove an actual violation of their rights as a predicate to an award of attorney's fees, it is conceivable that lawmakers presumed that the PLRA would force litigants to more carefully consider potential legal action and deter prisoners from making frivolous claims.

Plaintiffs argue the relationship between the award of attorney's fees to the initial filing of frivolous civil rights suits is "so attenuated as to be irrational" because most prisoner lawsuits are filed *pro se.* Reply at 5. However, a court cannot overturn legislation merely because "there is an imperfect fit between means and ends." *Heller,* 509 U.S. at 321, 113 S.Ct. 2637. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theater Co. v. Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730, (1913). Plain-

tiffs' burden is to negate every conceivable basis which might support the legislation. *Heller,* 509 U.S. at 320–21, 113 S.Ct. 2637. This they have not done. As long as the statute "find[s] some footing in the realities of the subject addressed by the legislation," *see id.* 321, 113 S.Ct. 2637, the court must uphold [it], even if [it] seem[s] "unwise" or work "to the disadvantage of a particular group, or if the rationale ... seems tenuous." *Romer,* 517 U.S. at 630, 116 S.Ct. 1620.

With respect to minimizing the public costs associated with prisoner civil rights litigation, plaintiffs also assert that although protecting the public purse is a legitimate interest, that interest may not be pursued by arbitrarily singling out a particular class of persons to bear the entire burden of achieving that end. Reply at 5–6 ("The only manner in which the distinction between prisoners and non-prisoners relates to the goal of protecting the public fisc is by making prisoners ... bear the entire extent of that burden for no other reason than the fact they are prisoners ....") (quoting *Bain* 65 F.Supp.2d at 605). Plaintiffs' argument, however, ignores the reality that, because it is conceivable that prisoners file a disproportionate number of frivolous suits compared to the population as a whole, it is reasonable for Congress to conclude that prisoners are causing a greater burden on the public purse in civil rights litigation than the public as a whole. Accordingly, the PLRA is neither arbitrary or irrational in its goal of minimizing costs to taxpayers.

As defendants also point out, abrogation of the catalyst theory in prisoner litigation is rationally related to the legitimate governmental interest in avoiding the possibility of penalizing prisons for making voluntary improvements in prison conditions. This encourages more effective prison management by enabling prison officials to institute changes without the risk that such actions would be deemed to be prompted by a lawsuit challenging prison conditions. With the catalyst theory in

place, once a lawsuit had been initiated, prison officials were put in the untenable position of instituting preferable prison management policies at the risk of paying a prisoners attorney's fees not only for the underlying litigation, but also for the litigation on the question of whether the lawsuit was actually the "catalyst" for the change. By abrogating the catalyst theory, it is conceivable that Congress intended to enable prison officials to better manage the penal system.

Finally, it should be noted that plaintiffs rely heavily on *Bain* in making their equal protection challenge. *Bain* addressed the constitutionality of the attorney's fee cap contained in § 1997e(d)(2).[6] The *Bain* court found that § 1997e(d)(2) had no rational basis for limiting the amount of attorney's fees awarded to prisoners who have succeeded on their civil rights claims when no such limitation existed for successful non-prisoner litigants. Said another way, the court could find no justification for distinguishing between prisoner and non-prisoner litigants once either has "prevailed" in their lawsuit under the appropriate standard.

The section of the PLRA at issue in the present case differs in that it actually sets the standard for a prisoner to be considered prevailing and thus, to be eligible for a fee award. As discussed previously, creating differing standards for prisoner and non-prisoner litigants is rationally related to the legitimate governmental interests set forth above, and therefore, § 803(d) is constitutional under the Equal Protection Clause of the Fifth Amendment of the United States Constitution. Accordingly, plaintiffs fee application must be denied.

### Conclusion

For the reason's stated above, plaintiff's application for attorney's fees pursuant to

42 U.S.C § 1988 is denied. An appropriate order follows.

### ORDER

Before the court is an application by plaintiffs, Richard Waterman and Michael Curtis, for attorney's fees and costs pursuant to 42 U.S.C. § 1988. Defendants filed opposition, and the Court decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth in the attached opinion,

**IT IS** on this 1st day of March, 2000,

**ORDERED** that plaintiffs' application is **DENIED.**

---

6. "Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defen-

dant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant." 42 U.S.1997e(d)(2).